105 T.C. No. 28


UNITED STATES TAX COURT


LUCKY STORES, INC., AND SUBSIDIARIES, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4446-93.                    Filed December 19, 1995.


        P made donations of its surplus bread inventory to
food banks which qualified as permissible charitable
donees under sec. 170(e)(3)(A), I.R.C., and claimed
charitable contribution deductions based upon full
retail prices for the bread. R determined the fair
market value to be approximately 50 percent of full
retail prices. <u>Held</u>, fair market value of P's bread
contributions redetermined.


        <u>Eric W. Jorgensen</u>, <u>Grady M. Bolding</u>, and <u>Russell D. Uzes</u>,
for petitioner.

        <u>Alan Summers</u> and <u>Kevin G. Croke</u>, for respondent.

NIMS, Judge:  Respondent determined the following deficiencies in petitioner's Federal income tax:

| Taxable Year Ending (TYE) | Deficiency |
|---|---|
| Jan. 30, 1983 | $8,797,328 |
| Feb.  3, 1985 |  2,175,135 |
| Feb.  2, 1986 | 48,255,017 |

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years at issue, and all Rule references are to Tax Court Rules of Practice and Procedure.

This case involves a number of issues that are being handled in proceedings that are separate from the one under present consideration.  In this proceeding, the parties dispute the fair market value of bakery products, unsold canned goods, and other general merchandise contributed to food banks by petitioner during the years in issue.

On its Federal income tax returns for TYE February 3, 1985 and TYE February 2, 1986, the charitable contribution years in issue, petitioner claimed deductions for the above charitable contributions in the amounts of $576,258 and $909,055, respectively.  The parties agree that the cost basis of the contributed bakery inventory for purposes of section 170(e)(3)(B) was $1,753,495 for TYE February 3, 1985, and $3,471,236 for TYE February 2, 1986.

For the taxable years in issue, petitioner concedes the portions of its claimed deductions relating to its contribution

of unsold canned goods and other general merchandise. The amount of petitioner's charitable deduction that relates to unsold canned goods and other general merchandise is $85,040 for TYE February 3, 1985 and $198,286 for TYE February 2, 1986.

For TYE February 3, 1985, petitioner concedes the charitable deduction amount of $91,624 relating to its contributions from its stores in Florida.

After these concessions, the only contributions at issue are the 4-day-old bread and other "aged" bakery goods from petitioner's California and Nevada stores. At the trial, the parties focused almost entirely on the 4-day-old bread, so we proceed upon the assumptions that the dollar amounts of the donations of other bakery products were relatively insignificant, and that our conclusion as to the value of the 4-day-old bread will establish the method for valuing these items.

The parties also appear to agree that (1) after petitioner's concession of the portions of its claimed deductions for the Florida donations and the donations of canned goods and other general merchandise, (2) after adjusting the cost basis for the remaining contributed bakery inventory, and (3) after the reduction required under section 170(e)(3)(B), the amounts of charitable deductions in dispute are $663,855 for TYE February 3, 1985 and $1,300,558 for TYE February 2, 1986, based on the retail

price of the contributed bakery inventory at the time of contribution.

Petitioner is a Delaware corporation. At the time it filed its petition, its principal place of business was Dublin, California.

FINDINGS OF FACT

Some of the facts have been stipulated.

During the years in issue, petitioner operated bakeries in northern and southern California that baked several varieties of white and wheat bread, muffins and buns, and other bakery products. Petitioner sold these private label products in its retail stores under the "Harvest Day" label. In addition, petitioner's bakeries purchased from unrelated bakeries other bakery products, including tortillas, fried pies, doughnuts, and dinner, gourmet, and brown and serve rolls, and other items, for sale in its stores.

Commercial bakers generally use one of three processes for preparing commercially baked bread: the sponge dough method, the liquid sponge method and the liquid brew method. These methods differ significantly in terms of ingredients and baking times. The method used affects the aroma, keeping quality, and texture of the bread. Petitioner used the sponge dough method during the tax years at issue. The sponge dough method is the most time-consuming baking process of the three general methods.

Petitioner's baking process resulted in a high quality bread, with good aroma, keeping quality, and texture. Petitioner used no preservatives or inhibitors in the manufacture of this bread.

During the years in issue, petitioner closed its bread bags with a flat plastic disc called a "Kwik Lok." Petitioner date stamped each Kwik Lok with a date that was 4 days after the bakery delivered the bread to a specific store. For example, petitioner date stamped the Kwik Loks for bread delivered to a store on September 16, 1985 (a Monday) with the date "Sep 20" (a Friday). The date was stamped on the Kwik Lok in very small print. The Kwik Lok contained no other words, such as "sell by," "fresh through," or the like.

Petitioner delivered to its stores each morning, except on Wednesdays and Sundays, bread and other bakery products that had been baked either earlier the same morning or after 6 p.m. the previous day. Bakery products that had been acquired by petitioner's bakeries were also delivered at the same time.

Each of petitioner's stores determined its need for delivery of fresh bread on a daily basis, based on amounts of bread on hand and anticipated sales. Each store transmitted its daily order to the bakery, which then adjusted its production to accommodate store orders. Petitioner's goal was to supply each store with 5 percent more bread on hand than was actually

expected to be sold. In fact, store orders exceeding actual sales were in the 6 percent range during the years in issue.

Petitioner's in-store employees placed the newly delivered bread either on the store shelves or in the stock room. If the bread were placed in the stock room, petitioner's employees later placed it on the shelves. Petitioner's bread shelves are generally 20 inches deep. In the front part of the shelf, a store's merchandisers typically stacked loaves of bread two-high, with the label, or "gusset," end facing out, and the date coded Kwik Lok facing in. In the back part of the shelf the loaves were also stacked two-high, but in this case the loaves were stacked parallel with the customer aisle. The older bread would be placed on the top layer; the newer bread on the bottom or in the back. Thus, the customer would have access to the oldest bread first, unless he/she deliberately "dug through" and "read the codes" to find the newest bread. A customer could buy a loaf of petitioner's bread on the third or fourth day after delivery, take it home, put it in a bread box or leave it on the counter for a week to 10 days, and still have a good, edible product. The customer could further extend the life of the bread by freezing it.

Bread that sits on the store shelf for 5 days does not lose nutritional value or taste, but does lose moisture, so the bread firms up a little bit, losing some "squeezeability." During the

years at issue, petitioner did not offer age-related discounts on its bread or other bakery products.

Petitioner regularly sold 4-day-old bread at full retail price on Sundays during the years in issue.  In addition, individual stores sometimes sold 4-day-old bread on other days of the week.  This would happen if a store found itself with an oversupply of bread inventory, in which case the store would cut off its order for new bread, and sell the 4-day-old bread instead.

On the five bread delivery days (Monday, Tuesday, Thursday, Friday, and Saturday) petitioner's policy was to remove any unsold bread on the fourth day after delivery.  For example, bread that was delivered on the morning of Monday, September 16, 1985 (and date stamped  "Sep 20", a Friday) if unsold, would be removed on the morning of Thursday, September 19, 1985, before the Thursday bread delivery.

As to petitioner's Southern California stores, pick-up vehicles from charitable organizations went to each store and picked up the unsold bread and other bakery products on the same day the unsold bread and other bakery products were removed from the shelves.  As to petitioner's Northern California stores, petitioner's delivery drivers loaded the removed bread and other bakery products into the delivery trucks and returned them to petitioner's San Leandro bakery.  Pick-up vehicles from

charitable organizations then picked up the unsold bread and other bakery products at the bakery that same day.

Petitioner incurred significant additional labor costs as a result of its charitable food donation program (i.e., the labor necessary to return the 4-day-old bread to the bakery).

The following chart is based upon petitioner's self-baked bread rotation schedule for the Northern California stores during the years at issue.

LUCKY STORES
**BREAD SCHEDULE**

**PRODUCT INFORMATION**                                    **DELIVERY, PICKUP, DONATION INFORMATION**

| **BREAD** BAKED BETWEEN | KWIK LOK COLOR BY CHARITABLE | LAST SALE DAY PER KWIK LOK DATE | BREAD DELIVERED TO STORES | REMOVED BREAD PICKED | REMOVED BREAD PICKED UP UP FROM STORES ORGANIZATIONS |
|---|---|---|---|---|---|
| 6:00 pm Saturday to 5:00 pm Sunday | Brown | Friday | By 9:00 am Monday | By 9:00 am Thursday | By 2:00 pm Thursday |
| 6:00 pm Sunday to 5:00 pm Monday | Pink | Saturday | By 9:00 am Tuesday | By 9:00 am Friday | By 2:00 pm Friday |
| 6:00 pm Tuesday to 5:00 pm Wednesday | White | Monday | By 9:00 am Thursday | By 9:00 am Monday | By 2:00 pm Monday |
| 6:00 pm Wednesday to 5:00 pm Thursday | White | Tuesday | By 9:00 am Friday | By 9:00 am Monday | By 2:00 pm Monday |
| 6:00 pm Thursday to 5:00 pm Friday | Green | Wednesday | By 9:00 am Saturday | By 9:00 am Tuesday | By 2:00 pm Tuesday |

As the chart reveals, white Kwik Loks were used for both Thursday and Friday deliveries. Each of the other three delivery days had its own Kwik Lok color.

Petitioner's Southern California stores generally adhered to the same schedule as the Northern California stores, except that petitioner's Southern California stores used different colored Kwik Loks and the charitable organizations picked up the bread at the Southern California stores rather than at the bakery.

More than 75 percent of the donated bread products consisted of 4-day-old bread, and the remaining percentage consisted of

tortillas, fried pies, doughnuts, bagels, brown and serve rolls and English muffins.

Petitioner began its policy of donating unsold 4-day-old bread and claiming a deduction based on its full retail price in 1983. Prior to 1983, petitioner removed, or "pulled," bread from its shelves two days a week--Mondays and Thursdays.  Prior to 1983, petitioner offered its pulled bread for sale, which included three, 4- and 5-day-old bread (depending on the pull day), on discount racks.  Bread that did not sell after being on the discount rack for 24 hours was either destroyed or donated.  Under petitioner's pre-1983 policy the pulled bread was discounted approximately 50 percent, for one day only, before it was discarded or donated.

Regional and national bakers, such as Continental (Orowheat), Kilpatrick's, and Campbell-Taggertt (Wonder Bread), which have a substantial share of the California pan bread market, sell their pan bread, after that bread is pulled from the retail selling shelves of supermarkets and other retailers, at thrift or bakery outlets at discounts ranging from 20 to 70 percent.

Petitioner's donations of bakery products to charitable organizations were "qualified contributions" of inventory under section 170(e)(3)(A) and section 1.170A-4A(b), Income Tax Regs.  The retail price of the contributed bakery inventory for purposes of section 170(e)(3)(B) was $3,081,204 for TYE February 3, 1985, and $6,072,353 for TYE February 2, 1986.

OPINION

Neither party has brought to our attention any prior case involving the application of section 170(e)(1) and (3) to charitable contributions of rapidly perishable inventory, and we know of none. However, Rev. Rul. 85-8, 1985-1 C.B. 59 deals with the application of section 170(e)(3) to charitable contributions of dated products, and is discussed infra.

The relevant provisions of section 170(e), in effect for the years in issue, are as follows:

(e)  Certain Contributions of Ordinary Income and Capital Gain Property.--

(1)  General Rule.--The amount of any charitable contribution of property otherwise taken into account under this section shall be reduced by the sum of

(A)  the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution), and

*    *    *    *    *    *    *

(3)  Special Rule for Certain Contributions of Inventory and Other Property.--

(A)  Qualified Contributions.--For purposes of this paragraph, a qualified contribution shall mean a charitable contribution of property described in paragraph (1) or (2) of section 1221, by a corporation (other than a corporation which is an S corporation) to an organization which is described in section 501(c)(3) and is exempt under section 501(a) (other than a private foundation, as defined in section 509(a), which is not an operating foundation, as defined in section 4942(j)(3)), but only if--

(i)  the use of the property by the donee is related to the purpose or function constituting the basis for its exemption under section 501 and the property is to

be used by the donee solely for the care of the ill, the needy, or infants;

(ii)  the property is not transferred by the donee in exchange for money, other property, or services;

(iii)  the taxpayer receives from the donee a written statement representing that its use and disposition of the property will be in accordance with the provisions of clauses (i) and (ii); and

(iv)  in the case where the property is subject to regulation under the Federal Food, Drug, and Cosmetic Act, as amended, such property must fully satisfy the applicable requirements of such Act and regulations promulgated thereunder on the date of transfer and for one hundred and eighty days prior thereto.

(B)  Amount of Reduction.--The reduction under paragraph (1)(A) for any qualified contribution (as defined in subparagraph (A)) shall be no greater than the sum of--

(i)  one-half of the amount computed under paragraph (1)(A) (computed without regard to this paragraph), and

(ii)  the amount (if any) by which the charitable contribution deduction under this section for any qualified contribution (computed by taking into account the amount determined in clause (i), but without regard to this clause) exceeds twice the basis of such property.

Thus, section 170(e)(1) limits the deduction for charitable contributions of ordinary income property to the basis of the property.  However, section 170(e)(3) allows a limited deduction in excess of basis for charitable contributions of inventory and other property to qualified donees.  (As previously stated, we have found (based upon the parties' stipulation) that petitioner's contributions were qualified contributions under section 170(e)(3)(A)).  If the inventory contributed to qualified donees has

appreciated in value, the reduction of the deduction otherwise required under section 170(e)(1) is limited to one-half of the ordinary income that would be recognized on a sale of the property for its fair market value, except that the deduction may not exceed twice the taxpayer's adjusted basis for the property.  See Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 35.2.2., at 35-25 (2d ed. 1990).

Section 170(e)(3) was added to the Internal Revenue Code by section 2135(a) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1928.  The staff report notes that under prior law (section 170(e) before amendment) the donor of appreciated ordinary income property (property the sale of which would not give rise to long-term capital gain) could deduct only his/her basis in the property rather than its full fair market value.  The purpose of section 170(e) as originally enacted in 1969 was to prevent high-bracket taxpayers from donating substantially appreciated ordinary income property to charities so as to be better off after tax than if they had simply sold the property.  Staff of Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, at 672 (J. Comm. Print 1976), 1976-3 C.B. (Vol. 2) 1, 684.

The General Explanation goes on to explain the reasons for the change:

> The rule that the donor of appreciated ordinary income property could deduct only his basis in the property effectively eliminated the abuses which led to its enactment; however, at the same time, it has resulted in

reduced contributions of certain types of property to charitable institutions.  In particular, those charitable organizations that provide food, clothing, medical equipment, and supplies, etc., to the needy and disaster victims have found that contributions of such items to those organizations were reduced.

Congress believed that it was desirable to provide a greater tax incentive than in prior law for contributions of certain types of ordinary income property which the donee charity uses in the performance of its exempt purposes. However, Congress believed that the deduction allowed should not be such that the donor could be in a better after-tax situation by donating the property than by selling it. [Id., 1976-3 C.B. (Vol. 2) at 684-685.]

The Committee Report thus reflects Congressional intent to allow a modified deduction, in limited situations, consisting of the taxpayer's basis plus a fraction of the unrealized ordinary income inherent in the donated property, but subject to an overall limitation of twice adjusted basis.

Section 1.170A-1(c), Income Tax Regs., deals with the valuation of a charitable contribution in property.  Section 1.170A-1(c)(2) and (3) provide:

(2)  The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts.  If the contribution is made in property of a type which the taxpayer sells in the course of his business, the fair market value is the price which the taxpayer would have received if he had sold the contributed property in the usual market in which he customarily sells, at the time and place of the contribution and, in the case of a contribution of goods in quantity, in the quantity contributed.  The usual market of a manufacturer or other producer consists of the wholesalers or other distributors to or through whom

he customarily sells, but if he sells only at retail the usual market consists of his retail customers.

(3) If a donor makes a charitable contribution of property, such as stock in trade, at a time when he could not reasonably have been expected to realize its usual selling price, the value of the gift is not the usual selling price but is the amount for which the quantity of property contributed would have been sold by the donor at the time of the contribution.

In the case before us, petitioner argues that it could have sold to its regular customers at full retail prices the same quantity of bread that it donated to food banks. Respondent argues that the donated bread was surplus inventory that petitioner could have sold only at a 50-percent discount, which would have brought the selling price below petitioner's adjusted basis.

Section 1.170A-1(c)(2), Income Tax Regs., after reciting the familiar general definition of "fair market value," provides the method for establishing fair market value in the case of donated inventory. Under the regulation, the fair market value is the price which the taxpayer would have received "if he had sold the contributed property in the usual market in which he customarily sells," in the quantity contributed. Sec. 1.170A-1(c)(2), Income Tax Regs. If the taxpayer sells only at retail (as here), the "usual market" consists of the taxpayer's retail customers.

Section 1.170A-1(c)(3), Income Tax Regs., limits the scope of the preceding section in those cases where it cannot be established that the taxpayer could have realized his usual selling price. In

this situation, the value of the gift is not the usual selling price, but rather the amount for which the <u>quantity</u> of property contributed could have been sold at the <u>time</u> of contribution.

It is our task in this case to match the facts against the set of hypotheses specified by the regulations so as to determine the fair market value of petitioner's donated bread.  Fair market value is not to be determined in a vacuum.  To the contrary, it must be determined with respect to the particular property in question at the time of contribution, subject to any conditions or restrictions on marketability.  <u>Cooley v. Commissioner</u>, 33 T.C. 223, 225 (1959), affd. per curiam 283 F.2d 945 (2d Cir. 1960).  Viewing the approach taken by the parties in presenting this case, we can perceive no principled basis upon which we could reach a compromise value that lies somewhere between petitioner's claim of full retail price, and respondent's claim of 50 percent of full retail price, nor do we think it would be appropriate to do.

We think respondent's proposed application of the regulations in question is unduly restrictive and inconsistent with Congressional intent.  In the years at issue, petitioner contributed about 6 percent of its private label bread production to food banks. Contributions of excess inventory that is not obsolete could seldom be valued at full retail price under respondent's view of the regulations because in most cases if a taxpayer could have sold contributed excess inventory at the time and in the quantity

contributed, it would have done so. In this case, petitioner deliberately overproduced its private label bread so to protect its stores against the possibility of empty shelves. We do not believe it should be penalized for doing so.

The parties focus mainly on the characteristics of the donated bread. Was there something about the 4-day-old bread that made it unsalable in petitioner's stores at full retail price? Petitioner's bakery delivered bread to the stores every day except Wednesdays and Sundays. Any unsold bread was removed from the shelves at the beginning of the fourth day after delivery, except for bread delivered on Thursdays, which was removed on Mondays.

The bread wrappers were closed with color coded Kwik Loks indicating the so-called "pull date." Each delivery day of the week had its own color code except for Thursdays and Fridays. For both of these days, white Kwik Loks were used indicating a Monday pull date for both. While the white Kwik Loks for bread delivered on Thursday and Friday bore different date codes, the date codes were significant only to someone deliberately seeking to distinguish between Thursday and Friday bread. The date codes were of no significance to the store merchandisers, who relied on the colors on the Kwik Loks to determine pull dates. (The date codes could presumably have had significance to the store operators if week-old bread somehow got scrambled with fresh bread; e.g., the date codes

would have been useful to distinguish between Monday's bread from Week One and Monday's bread from Week Two.)

The bread donated to the food banks was "4-day" bread except on Mondays, when the donation was a combination of 4- and 5-day bread (a combination of Thursday and Friday deliveries). The parties focus their attention on Sunday sales, since that was the day on which sales of 4-day bread were most likely to be made. Respondent argues that petitioner has not proved that any Thursday (4-day) bread was sold, and that even if some 4-day bread was sold, the quantity sold was insignificant.

Petitioner has no records that would establish the quantity of Thursday bread sold on Sundays, or delivered to food banks on Mondays. The maintenance of such records would have required the reading and counting of the minutely printed date codes early on Sunday and Monday mornings, and would have served no apparent corporate purpose.

When the store merchandisers periodically stocked the shelves, they placed the older bread on the top layer in the front of the shelves, where the older bread was more likely to be sold than the newer bread that was placed under the older bread or in the back of the shelves, perpendicular to the bread in front whose labels faced the customers. But the Thursday and Friday bread eventually were intermingled, since both bear white Kwik Loks and the store merchandisers are indifferent to the date codes, which the Court has

found, based upon actual observation of a sample Kwik Lok, to have been obscurely printed and hard to read. At trial the Court observed that petitioner's own bakery chief, Alvin Lewis, had trouble reading the date code on the specimen in evidence without adjusting his glasses.

It also appears unlikely that many customers would have rejected the Thursday bread merely on the basis of "squeezeability". Mr. Lewis testified that while "one day" bread is distinctive in feel from 3- and 4-day bread, since it contains more moisture, "from the third and fourth [day] you [can] probably never tell any difference."

Respondent argues that even admitting for the sake of argument that petitioner sold Thursday--4-day--bread on Sundays, the amount sold was small because Friday and Saturday deliveries intervened, and the quantity of Thursday bread remaining for Sunday sale necessarily had to be small. Referring to the phrase "quantity contributed" in section 1.170A-1(c)(2), Income Tax Regs., respondent seeks to compare unfavorably the quantity of 4-day bread sold on Sunday to the quantity of 4-day bread petitioner normally contributed on other days. We do not think this argument holds water. Obviously, the amount of Thursday bread available for sale on Sundays, after Friday and Saturday sales of Thursday bread had depleted the supply, would be less than the amount of 4-day bread donated to the food banks on other days. The significant fact is

that 4-day bread <u>was</u> sold on Sundays at the usual retail price, not the quantity that was sold, which necessarily had to be smaller than the Friday and Saturday bread remaining on the shelves.

Respondent asserts that it is "industry practice" to pull bread after 3 days and that other grocery chains sell it at a 50- percent discount on discount racks or in thrift stores. Even though petitioner chose to do otherwise, respondent argues, the industry practice establishes the price, and therefore the fair market value, at which petitioner could have sold the donated bread at the time of the contribution. Respondent points to section 1.170A-1(c)(3), Income Tax Regs., which limits the fair market value of contributed inventory to the amount for which the quantity of property in question could have been sold at the time of the contribution. Petitioner disputes respondent's assumption as to what is industry practice. While respondent's argument has some force on this point, we do not believe industry practice, such as it is, establishes the price for which petitioner could have sold the donated bread.

First, the record does not establish when other supermarket chains pulled their bread for sale at discount. Mr. Lewis testified that he was uncertain what practice petitioner's competitors followed regarding the time bread was left on the shelf, although he believed that during the years in issue one of the competitors, Alpha Beta, left its bread on its shelves a little longer than did petitioner. He conceded, however, that petitioner makes an effort

to remain abreast of the competition, so it stands to reason that petitioner would try to avoid getting a reputation for selling stale bread by leaving it on the shelves longer than its competition did.

The parties stipulated that regional and national bakers that have a substantial share of the California pan bread market sell their bread, after it is pulled from the shelves, at thrift or bakery outlets at discounts ranging from 20 to 70 percent. Undoubtedly petitioner could have sold its bread at thrift outlets had it chosen to do so, but this fact does not establish that petitioner could not sell its 4-day bread at regular retail prices. At best it merely tends to show that petitioner could have sold "old" bread at a discount when it had in effect announced to the public that the bread being offered at a discount was old.

Respondent points to the general definition of fair market value contained in the first sentence of section 1.170A-1(c)(2), Income Tax Regs., and argues that 4-day bread could not have been sold to "fully informed consumers," that common sense forces the conclusion that the Sunday sales were the product of "ignorance on the part of the customer," and "compulsion; i.e., the older bread was all that was left and the customer had no other choice." But by focusing solely on the first sentence of the regulation, as respondent has done, it is necessary to disregard the rest of the regulation which, as we have already pointed out, provides the specific method by which fair market value is determined in the context of contributed

inventory. Accordingly, generalized concepts such as respondent would have us apply must give way in this instance to specific rules.

Rev. Rul. 85-8, 1985-1 C.B. 59, as noted above, deals with charitable contributions of dated products. Neither party discusses, or even cites, this ruling, but for completeness we deem it necessary to consider it. Revenue Rulings are not accorded the force of precedent in the Tax Court. Rather, they represent the position of the Commissioner on a given issue, and we deal with Rev. Rul. 85-8 in that light. Estate of Lang v. Commissioner, 64 T.C. 404, 406-407 (1975), affd. in part and revd. in part on other grounds 613 F.2d 770 (9th Cir. 1980).

Rev. Rul. 85-8 holds that when a corporation donates products in inventory to a charitable organization shortly before the products' expiration date, the amount allowable as a charitable contribution deduction is equal to the taxpayer's basis in the property plus one-half of the unrealized appreciation, not to exceed twice the taxpayer's basis in the property. The ruling, however, presupposes the fact that we are charged with determining, namely, the amount of "unrealized appreciation." We quote the "facts" of the ruling as follows:

> Corporation X, which is not an S corporation as defined in section 1361(a)(1) of the Internal Revenue Code, is a pharmaceutical manufacturer. X manufactures products that are subject to the requirement that an "expiration date" be

imprinted on the product or its container.  The products may not be legally sold after the expiration date.

Shortly before the expiration date of products that ordinarily were sold by X for 10x dollars, X made a qualified contribution of such products within the meaning of section 170(e)(3)(A) of the Code.  On its Federal income tax return, X claimed a deduction of 10x dollars for this contribution.  At the time of the donation, if X had sold the products in the usual market in which it sold such products, X would have realized only 5x dollars.  X could not reasonably have been expected to realize its usual selling price for the products due to the imminence of the expiration date after which the products could not be sold legally.  X's basis in the products was 1x dollars.  [Rev. Rul. 85-8, 1985-1 C.B. at 59.]

It will be seen that under the postulated facts an "expiration date" was required, presumably by law, and the products could not be legally sold after the expiration date.  In the case before us an expiration date was not a legal requirement, nor is there any legal impediment related to the expiration date.  We recognize, of course, that market forces would no doubt impose a practical impediment to retail sales after the date on the Kwik Lok, except at a substantial discount at thrift stores or on discount racks.

The ruling assumes that because the expiration date was imminent, "X could not reasonably have been expected to realize its usual selling price ".  Id.  We think our case is different.  Here, we are dealing with donations of rapidly perishable inventory which petitioner had on hand for sale for a very short time, so that the bread donations on the pull date--the day before the date code expiration date--have to be viewed in a context different from that of the ruling.  This was not inventory which had been on hand for a

considerable period of time before it was donated. Instead, it was very much "fast in, fast out," inventory. Consequently, while we do not necessarily quarrel with the Commissioner's conclusions in Rev. Rul. 85-8, based upon its specific facts, we do not believe the revenue ruling suggests that similar conclusions necessarily need be reached in this case.

Petitioner retained Professor Daniel L. Rubinfeld to furnish an expert opinion as to the value of the 4-day-old bread that petitioner donated. Professor Rubinfeld teaches law and economics at the University of California at Berkeley and is a principal with the Law and Economics Consulting Group. His expert report is a statistical analysis based upon a physical count of petitioner's bread sales over a 2-week period in six representative stores. Professor Rubinfeld concludes from his statistics that, if bread is only a few days old, consumers are indifferent to its age and will pay full retail price for it.

Neither party addresses Professor Rubinfeld's statistical analysis on brief (although respondent does attack certain perceived defects in the "survey" upon which it is based). Professor Rubinfeld's conclusion is founded upon certain statistical averages referred to in his report. This report, however, fails to explain why these statistical averages are reliable estimates; the standard deviations of these averages are left uninterpreted. Without some assistance from the parties, therefore, we are unwilling to

undertake the kind of detailed analysis that would permit us to determine whether Professor Rubinfeld's analysis supports the opinion he expresses or rejects it.  We have therefore not relied upon his report in deciding this case.

Our review of the facts convinces us that on Sundays, and occasionally on other days, petitioner could and did sell 4-day bread at regular retail prices, and in sufficient quantities so as to constitute meaningful sales.  Congress, by enacting section 170(e)(3), intended to encourage donations of the type in question for the direct use of a special and narrowly limited class of recipients; namely, the ill, the needy, and infants.  Section 170(e)(3)(A).  As the Conference Committee Report quoted above notes, before the addition of section 170(e)(3), contributions of food, clothing, medical equipment, and supplies for the benefit of such persons had dried up as a result of the limitations imposed by section 170(e)(1).  We think section 170(e)(3) and sections 1.170A-1(c)(2) and (3), Income Tax Regs., should not be interpreted in such a restrictive way as to unnecessarily inhibit donations of the type Congress meant to encourage, and certainly petitioner's bread donations are of that type.

Furthermore, we again note that Congress was careful to draft section 170(e)(3)(B) in such a way as to prevent the situation where a taxpayer would be better off, after tax, by donating the property than it would have been if it had sold the donated property and

retained all the after-tax proceeds of the sale. Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1976, at 672 (J. Comm. Print 1976), 1976-3 C.B. (Vol. 2) at 684. Thus, petitioner's donations do not present an opportunity for the type of tax avoidance unintended by Congress.

For the foregoing reasons, we agree with petitioner that its bakery product donations to food banks should be valued at full retail prices, and we so hold.

At the trial, petitioner sought to have a letter stipulated into evidence to which respondent raised a hearsay objection. See Fed. R. Evid. 801(a). The letter was addressed to a revenue agent, and was obtained by petitioner from respondent in the course of informal discovery. Petitioner did not call the author of the letter as a witness, nor did petitioner attempt to account for his unavailability. The Court reserved judgment as to the admissibility of the letter. After further consideration, the Court now rules that respondent's objection is sustained. Informal discovery is used, in part, to lead the discovering party to admissible evidence, not to automatically validate it. Zaentz v. Commissioner, 73 T.C. 469, 471-472 (1979).

To reflect the foregoing, and to give effect to settled issues and the issue remaining to be resolved,

An appropriate order will be

<u>issued directing entry of decision</u>

<u>under Rule 155 upon completion of</u>

<u>proceedings resolving the remaining</u>

<u>issue in this case, and sustaining</u>

<u>respondent's hearsay objection</u>.